UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION

Eastern District of Kentucky
FILED

FEB 0 2 2006

AT LEXINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

CIVIL ACTION NO. 04-345-KSF

JAMES D. DUFF                                                              PLAINTIFF

V.                              **OPINION & ORDER**

DAVID A. DUFF, ET AL.                                                     DEFENDANTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court on defendant David A. Duff's motion for summary

judgment on plaintiff's claims concerning the trust estate of Ira D. Duff, Jr. [DE #106] and

defendant David Duff's motion for summary judgment on plaintiff's claims concerning the trust

estate of Ira D. Duff, Sr. [DE #107]. Having been fully briefed, these matters are ripe for review.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This lawsuit involves the trust estates of Ira D. Duff, Jr. ("Donnie") and Ira D. Duff, Sr.

("Don, Sr."). Specifically, Plaintiff's cause of action involves the ownership of Pine Branch Coal

Sales Company, Inc. ("Pine Branch"). Pine Branch is a closely-held, family-operated mining

company located in Chavies, Kentucky. During early 1980, the stock ownership of Pine Branch

was predominantly held by Don, Sr., Donnie (Don, Sr.'s son), David A. Duff ("David") (Don,

Sr.'s son), and Susan Duff (David's wife). The Duff family owned 75% of the stock and the

remaining 25% was owned by Whitaker Coal Corporation ("Whitaker").

In November of 1980, Pine Branch exercised the option to purchase Whitaker's 25%

interest in Pine Branch for $2.4 million. After exercising the option to purchase Whitaker's 25%

interest, the ownership of Pine Branch was as follows:

1.    Don, Sr. held 37.26% of the shares of Pine Branch;

2.    Donnie held 31.37% of the shares of Pine Branch; and

3.    David and his wife Susan held 31.37% of the shares of Pine Branch.

On January 10, 1981, Donnie died in a helicopter accident at the age of 34 years. At the time, he had two children – Marguerita Jane Duff, 12 years old and James David Duff, 10 years old. Prior to his death, Donnie had executed a Last Will and Testament, which created a testamentary trust for each of his two children.  Donnie's Will nominated David as executor and trustee for the testamentary trusts under the Will.  On January 16, 1981, the Perry District Court appointed David as both Executor and Trustee under the Will.

The Will granted David extensive powers and broad discretion regarding the administration of the testamentary trusts, including but not limited to the power to purchase, sell, liquidate, exchange, or dispose of trust estate assets.  For example, the Will grants the Trustee the power to retain property and specifically states that the Trustee shall not incur any liability for retaining any such property. *See* Last Will and Testament of Ira Donald Duff, Jr., p.3.  It also gives the Trustee the power to dissolve, liquidate or sell any business enterprise owned by Donnie at the time of his death in the sole and absolute discretion of the Trustee. *Id.* The Will only states that David could not purchase, sell, liquidate, exchange or dispose of trust estate assets "for less than adequate consideration in money or moneys worth." *Id.*

## A.    Sale of Donnie's Interest in Pine Share

In April of 1981, David decided to sell the 12 shares (31.37%) of Pine Branch stock held by Donnie's estate. David contends that he decided to sell the trust estate's Pine Branch stock in

2

order to raise money to pay the applicable estates taxes.  On April 20, 1981, David, as Executor

and Trustee, executed a Stock Purchase Agreement with Pine Branch to sell Donnie's 31.37%

interest for $1,700,000.  David arrived at the $1.7 million figure after employing Blackman,

Kallick & Company, Ltd. ("Blackman Kallick"), a Chicago based accounting firm, to determine

the value of Donnie's equity interest in Pine Branch.  The original agreement stipulated that Pine

Branch would pay $700,000 to Donnie's estate on or before October 9, 1981, and then pay

$1,000,0000 over eight years at 12% interest in monthly installments beginning in November of

1981.[1]  In April of 1983, after receiving a report by the Internal Revenue Service, valuing the

share of Donnie's stock at $1,883,000, Pine Branch agreed to pay Donnie's estate an additional

$183,000, along with interest.

After the sale of Donnie's shares, the ownership of Pine Branch included: (1) Don, Sr.

owning 54.29%, and (2) David and Susan owning 45.71%.  Much of Plaintiff's allegations

surround David's decision to sell Donnie's shares of Pine Branch.  Plaintiff claims that David

engaged in an act of self-dealing since the sale of Donnie's shares increased his percentage

ownership of Pine Branch from 31.47% to 45.71%.

## B.   Termination of the Testamentary Trust

In 1990, David began the final settlement of the testamentary trusts in accordance with

Donnie's Will.  In September of 1990, James, Marguerita and their mother, Brenda Duff, met

with David at the Pine Branch office.  David explained the financial transactions that had

---

[1] At the same time as the sale of the Pine Branch stock, David and Don, Sr. purchased the
one-third interest of Coren Leasing, another company owned by Don, Sr., Donnie and David,
contained in Donnie's trust estate for $15,000.  David states that he and Don, Sr. arrived at this
value based on the value of the equipment held by Coren Leasing less the amount of debt that was
owed on that equipment.

3

occurred, including the disbursements made, the investments that had been chosen, and the investments that were to be transferred to James and Marguerita. James asserts that he learned for the first time at this meeting that the 12 shares of Pine Branch stock contained in Donnie's trust estate had been sold.

David argues that he provided several documents to James during this meeting. These documents include the "Final Accounting for James David Duff Trust"(the "Final Accounting"). The Final Accounting detailed the: (1) assets and liabilities of Donnie's trust estate, the fair market value of each asset and the amount of each liability; (2) a summary of the income, taxes, expenses and distributions of Donnie's trust estate; and (3) a listing of all assets of James's testamentary trust, the value of these assets and where these assets were invested.

David also provided to James a document entitled the "Marguerita J. Duff / James D. Duff Trust Synopsis" (the "Trust Synopsis") that explained the decision to sell Donnie's trust estate's 12 shares of Pine Branch stock. The Trust Synopsis also discussed the valuation of those shares and Pine Branch's payment for the stock.

Another document David gave to James was a document entitled "Release and Waiver of Hearing by James David Duff" (the "Release").[2] Plaintiff signed the Release approximately 12 weeks after the September 1990 meeting, on December 14, 1990. James contends that he did not read the Release prior to signing it. The Release stated that David had accounted for all of the monies and assets in the trust, David had explained to James all of the transactions undertaken by David as Trustee, David had answered all of James's questions in regard to the administration

---

[2] James does not dispute receiving a copy of the Final Accounting, Trust Synopsis or Release.

4

of the estate, James released and discharged David from "all legacies, dues and demands which [James] may have whatsoever under or by virtue of his acting as Trustee" under the terms of Donnie's Will, and James released David from any liabilities arising out of his administration of the Trust assets.

In December of 1990, David moved the Perry District Court to terminate the testamentary trust. David provided to the Perry District Court the Final Accounting, the Release, and a document entitled "Final Settlement of David A. Duff as Trustee" (the "Final Settlement"). David also moved to seal the Final Accounting. On December 18, 1990, David, Brenda and Ron Combs, Esq., a local attorney who had drafted Donnie's Will and later advised David, attended the hearing in Perry Circuit Court on David's administration of the testamentary trust and his motion to terminate the trust. During his deposition herein, James acknowledged that he had knowledge of the hearing, but chose not to attend because he was taking final exams at Eastern Kentucky University at the time of the hearing.

After the hearing, the Perry District Court entered an "Order Accepting Final Accounting and Final Settlement of David A. Duff as Trustee for James David Duff". The Order states that David and Brenda confirmed to the Court that the financial information contained in the Final Accounting had been explained to James and that his questions had been answered. The Perry District Court also relieved David from any further liability, duties and responsibilities regarding his trusteeship and terminated the trust.

**D.      Administration of the Estate of Ira D. Duff, Sr.**

Don, Sr. passed away on July 24, 1998 and the Perry District Court appointed David as executor of his father's estate pursuant to Don, Sr.'s Last Will and Testament. A portion of Don,

5

Sr.'s estate was used to fund trusts created under a Revocable Trust Agreement in 1996. After

Don, Sr.'s wife disclaimed her interest arising under the Trust Agreement, Don, Sr.'s estate was

distributed as follows: (1) 50% of any stock in Pine Branch and 50% of any interest in Haleys'

Branch, LLC would be held in trust, with David as trustee, for the benefit of James and

Marguerita until David's death; and (2) the remainder of Don, Sr.'s estate to David in fee simple.

Don, Sr.'s will stated that the estate taxes be paid out of his residuary estate to be

apportioned among the beneficiaries in the same proportions as the value of that portion of the

estate received by each beneficiary. David retained Robert Fasey, a certified public accountant,

and Henry C.T. Richmond, III, a tax attorney with Greenebaum, Doll & McDonald, to assist him

with the payment of estate and inheritance taxes owed on Don, Sr.'s estate.

In order to pay the estate and inheritance taxes, David decided to sell a portion of Don,

Sr.'s Pine Branch stock. With respect to Plaintiff, 887 shares of Pine Branch stock, which were

used to satisfy his proportionate share of estate taxes, were redeemed at $331 per share. Pine

Branch also redeemed the same amount of shares for Marguerita. Finally, Pine Branch redeemed

all of the shares of Pine Branch stock that were devised to David at $331 per share. David

distributed 813 shares of Pine Branch stock to a trust created under the Trust Agreement and

maintained for Plaintiff's benefit. James now complains that David should have elected to pay the

taxes over a period of 10 years instead of selling the shares of Pine Branch stock in order to pay

the taxes in full.

## II.    SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986). In reviewing a motion for summary judgment, "this Court must determine whether

'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law.' " *Patton v. Bearden*, 8 F.3d 343, 346

(6th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The

evidence, all facts, and any inferences that may permissibly be drawn from the facts must be

viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v.

Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the

nonmoving party's case, the nonmoving party must present "significant probative evidence" to

demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore

v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are

not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343.

"The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will

be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving

party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252. "If the evidence is merely colorable,

or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations

omitted).

## III.    ANALYSIS

Defendant has filed separate motions for summary judgment regarding the estates of

Donnie and Don, Sr. The Court will address each motion separately.

A.      **Estate of Ira D. Duff, Jr.**

1.      **Statute of Limitations**

Defendant argues that the applicable statute of limitations for terminated trusts, KRS

386.735, bars all of James's claims regarding his father's trust estate.  KRS 386.735 states:

> Unless previously barred by adjudication, consent or any limitation
> established by KRS Chapter 413, any claim against a trustee for
> breach of trust is barred as to any beneficiary who has received a
> final account or other statement fully disclosing the matter and
> showing termination of the trust relationship between the trustee
> and the beneficiary unless a proceeding to assert the claim is
> commenced within six (6) months after receipt of the final account
> or statement. In any event and notwithstanding lack of full
> disclosure a trustee who has issued a final account or statement
> received by the beneficiary and has informed the beneficiary of the
> location and availability of records for his examination is protected
> after three (3) years. A beneficiary is deemed to have received a
> final account or statement if, being an adult, it is received by him
> personally or if, being a minor or disabled person, it is received by
> his representative.

KRS 386.735, thus, lists two time limitations: a six-month limitation and a three-year limitation.

Kentucky courts have interpreted this provision as follows: "any action by a beneficiary against a

trustee for breach of trust must be commenced within six months after receipt of the final account

or statement, assuming full disclosure.  Lacking full disclosure, the beneficiary's action against the

trustee is barred after three years from the date of final account." *Cecil v. Cecil*, 712 S.W.2d 353

(Ky.App. 1986).

David contends that by September 1990, he had fully disclosed to James both the sale of

the Pine Branch shares of stock and the Coren Leasing partnership interest.  Both the Trust

Synopsis and Final Accounting, given to James, detailed these transactions.  Since the

testamentary trust terminated on December 18, 1990, the limitations period set forth in KRS

8

386.735 began running no later than December 18, 1990.

Although David states that the six-month limitations period applies in this case, James states that in order for the six-month limitations to apply, the Final Accounting and other documents provided to James must have "fully disclose[d] the matter" relevant to each of James's claims. James states that in order to meet the requirement of full disclosure, David must have disclosed his self-dealing.

James cites *Hutchings v. Louisville Trust Company*, 276 S.W.2d 461 (Ky. 1955),[3] for the proposition that a self-dealing fiduciary "must not only reveal the material facts, but also must explain that the transaction involved self-dealing and that the beneficiaries are entitled to legal remedies to redress for that self-dealing." (Plaintiff's Response [DE #110], p. 27). Plaintiff's reading of *Hutchings* overextends what the case actually states. *Hutchings* first states, "It is the law, however, that a statement in the account merely of the fact of an investment, without a disclosure of self-dealing, does not render a decree binding on parties who fail to object." *Hutchings* then continues, "An accounting can be required of a trustee, notwithstanding an allowance of his final account, if the facts of self-dealing were not disclosed in the account nor litigated and the complainant had no reasonable notice of the facts when the order was made." *Id.* at 465. In *Hutchings*, the court found that although the financial transaction at issue was disclosed, the defendant did not present any information to plaintiffs to put plaintiffs on notice that there was anything illegal about the investment. Since the trustee failed to disclose all of the material facts that would put the beneficiary on notice that a breach of trust may have been

---

[3] KRS 386.735 is not mentioned in *Hutchings*. The statute did not become effective until 1976, more than 20 years after the decision in *Hutchings*.

committed, plaintiffs were not precluded from seeking an accounting. *Id.* at 465.

In the instant case, James lists several material facts that David allegedly failed to disclose to James. The Court will examine each of James's complaints of lack of disclosure. But, first, it will examine the meaning of full disclosure.

KRS 386.735 requires a "final account or other statement fully disclosing the matter". The essential question before the Court in this matter is: what is required of a trustee to "fully disclos[e]" the matter?    Unfortunately, no Kentucky caselaw directly addresses the issue of full disclosure under KRS 386.735.  Thus, the Court must decided whether David fully disclosed the matter in order to trigger the six-month statute of limitations.[4]  "It is the trustee's duty to disclose to the beneficiary fully, frankly, and without reservation all facts pertaining to the trust." *In re Enger's Will*, 225 Minn. 229, 239 30 N.W.2d 694 (1948).  Another court has described the issue of full disclosure as follows: "The controlling question is always whether the alleged fraud prevented the party from knowing about and presenting his legal rights at trial." *Montgomery v. Kennedy*, 669 S.W.2d 309, 314 (Tex. 1984).  This comports with the court's decision in *Hutchings* that,  "An accounting can be required of a trustee, notwithstanding an allowance of his final account, if the facts of self-dealing were not disclosed in the account nor litigated and the complainant had no reasonable notice of the facts when the order was made." *Id.* at 465.  In *Enger's Will*, the court stated, "Because a beneficiary may rely upon the disclosures in the trustee's account and the petition for its allowance, a proceeding for the allowance of the account

---

[4] If the operative facts are not in dispute, a statute of limitations question presented is typically one for the court to decide as a matter of law under Kentucky law. *See Hall v. Musgrave*, 517 F.2d 1163, 1164 (6th Cir. 1975) (citing *Lynn Mining Co. v. Kelly*, 394 S.W.2d 755 (Ky. 1965); *Slack v. Bryan*, 299 Ky. 132, 184 S.W.2d 873 (1945)).

does not impose upon the beneficiary as an ordinary adversary the burden of making his own inquiry to ascertain the truth of the trustee's disclosures." *Id.* at 240. *Compare Brockway v. Mich. Nat'l Bank*, 1999 WL 33438822 (Mich App. 1999) (finding that a fiduciary is not required to disclose the breaches of his fiduciary duty under a Michigan statute identical to KRS 386.735; it was sufficient that the final account reflected what occurred with an asset).

### a.      The Purchase of the Trust Estate's Shares of Stock

First, James contends that David engaged in self-dealing when selling the trust estate's shares of Pine Branch stock and he failed to disclose to James this self-dealing. There is no dispute that in 1990, David disclosed to James that the 12 shares of Pine Branch stock had been sold. The Financial Accounting and Trust Synopsis explicitly state that the shares had been purchased by Pine Branch and the amount paid by Pine Branch for the 12 shares.

James, however, complains that David failed to inform him that he had engaged in self-dealing when selling the stock. The basis of James's allegation of self-dealing is that David's interest in Pine Branch increased from 31.47% to 45.71% when he sold the trust estate's shares of stock. For James to argue that he had no knowledge of this alleged self-dealing seems disingenuous. During his deposition, James testified as follows:

> Q:     How old were you when your father passed away?
>
> A:     Ten.
>
> Q:     And did you have an understanding at or about the time of your father's death that Pine Branch Coal Company was owned by the Duff family?
>
> A:     Oh, yeah.

11

Q:   So you knew your father, your grandfather, and your uncle
     owned it?

A:   Yeah.

(James Duff depo., p.40). James has known since 1990 that the 12 shares of Pine Branch stock held by Donnie's trust estate were purchased by Pine Branch. James also knew for many years prior to 1990 that the owners of Pine Branch prior to the purchase were Don, Sr., Donnie and David. Therefore, the Court finds that James had "reasonable notice of the facts" as required by *Hutchings* that a purchase of the 12 shares of stock by Pine Branch could have increased David's shares of stock in Pine Branch. The Court concludes that James had knowledge of David's self-dealing in 1990, thus, there was full disclosure sufficient under KRS 386.735 to commence the six-month limitations period at that time.

**b.     The Whitaker Coal Corporation Transaction**

In addition to arguing that David failed to reveal his self-dealing, James also asserts that David did not make a full disclosure as required by the statute because he did not disclose the purchase price that was paid to Whitaker in 1980 for the purchase of its 25% share of Pine Branch stock. In November of 1980, just a few months before Donnie's death, Pine Branch exercised the option to purchase Whitaker's 25% interest in Pine Branch for $2.4 million. David states that he provided James with a Trust Synopsis that detailed the sale of the Pine Branch stock. The Trust Synopsis expressly references the Blackman Kallick Report and the contact information for Blackman Kallick. The Blackman Kallick Report contains a significant discussion of the Whitaker transaction, including the price paid by Pine Branch for a return of the stock held by Whitaker. Thus, David has asserted that even though he may have not explicitly told James

12

about the Whitaker transaction, he informed James that he arrived at the stock valuation based on the Blackman Kallick Report, which could have been accessed by James.

In September of 1990, during a meeting between James, Brenda, Marguerita, and David, David presented the Trust Synopsis and Final Accounting to James. Although the Trust Synopsis and Final Accounting did not mention the Whitaker transaction, the documents did state the value of the 12 shares of stock and how Pine Branch arrived at that value. If James had any question about the value of the 12 shares of stock, he had information about how to obtain the Blackman Kallick Report. During the meeting, David even suggested to James that he visit Tip Richmond, a Lexington attorney, about legal advice and estate planning. James testified that he did meet with Richmond in October of 1990. James then signed the Release on December 14, 1990. The Perry Circuit Court hearing on the trust termination did not occur until December 18, 1990. Thus, James had approximately three months to further question the valuation of the Pine Branch stock, which he apparently did not do. Instead, he signed the Release and acquiesced to the Perry District Court terminating his trust. Accordingly, under the facts of this case, the Court finds that David fully disclosed the facts surrounding the purchase price of the Pine Branch stock.

### c.   The Wrongful Death Litigation

Third, James complains that David did not reveal the inherent conflict of interest in him bringing the wrongful death litigation against the manufacturer of the helicopter Donnie was piloting, Hughes Helicopter, Inc., and its parent, Summa Corporation (collectively referred to as "Hughes/Summa"). David, as Executor of Donnie's estate, also sued the owner of the helicopter, Thoroughbred Helicopter Service, Inc. ("Thoroughbred"). James claims that there was an incurable conflict of interest that was created for David. This conflict of interest involves a third

13

party complaint brought by Thoroughbred against Pine Branch for indemnification. James postulates that since David was an officer in Pine Branch he had an interest in not maximizing a recovery in the wrongful death suit because the recovery might have ended up being paid by Pine Branch via Thoroughbred's indemnification claim.

In his deposition, James acknowledges that during the September 1990 meeting, David informed him that the wrongful death litigation had settled for approximately $1.5 million. *See* James D. Duff Depo., pp. 43-44, 190-191. David, therefore, maintains that all of the facts were disclosed to and/or available to James in 1990. David has not presented any evidence that he disclosed anything more to James than the lawsuit had been instituted and eventually settled for $1.5 million.

Even if James correctly contends that David did not make a full disclosure because he failed to reveal the conflict of interest in bringing the wrongful death litigation, James's breach of trust claim with respect to the wrongful death lawsuit appears to be a new claim brought by James for the first time in his response to Defendant's motion for summary judgment. James did not assert a claim regarding the wrongful death lawsuit in his complaint and he never identified this claim in his answers to David's written discovery. In his deposition, James stated that he was not certain whether he was going to assert a claim concerning the wrongful death lawsuit.

In *Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997), the plaintiff first asserted an allegation of evidence-tampering in her response to the defendants' motion for summary judgment. The Sixth Circuit noted that the plaintiff had been free to seek leave to amend her complaint again to raise her new theory of falsification of evidence, or to file a new complaint against defendant explicitly raising that claim, but she failed to do so. The Sixth Circuit

concluded that the district court had not erred in dismissing plaintiff's complaint by failing to consider a cause of action that she had not yet alleged. *Id.* at 872.

More recently, in *Tucker v. Union of Needletrades, Industrial, and Textile Employees*, 407 F.3d 784 (6th Cir. 2005), the Sixth Circuit upheld a lower court's refusal to consider the merits of the plaintiff's claim that was not stated until the summary judgment phase. The Sixth Circuit noted that the district court had found that in opposing summary judgment, plaintiff had advanced new claims "that were never pled," and that there was "nothing in [her] Complaint to put Defendants on notice" of her promissory-estoppel claim. Because of its finding that plaintiff "had the information on which to base these claims in her initial Complaint, or she could have amended her complaint early on in this litigation," the district court refused to consider her promissory-estoppel claim. *Id.* at 789.

In the instant case, James's complaint makes no mention of David's breach of trust with regard to the wrongful death litigation. David claims that James never identified this claim in his answers to David's written discovery. During James's deposition, David's counsel specifically asked James if he was making any claim with respect to any improprieties in the wrongful death litigation. James responded, "Well, my attorneys pointed out to me that Hughes or somebody was seeking court approval. I didn't know that till just the other day. Whether I'm going to make that a claim or not, I don't know yet." *See* James D. Duff Depo., p. 197. Thus, the Court will dismiss James's claims with respect to the wrongful death lawsuit because any such claims were not previously pled.

In conclusion, Donnie chose to nominate David as executor and as trustee for the testamentary trusts under the Will. Donnie also granted extensive and broad discretion to David

15

regarding the administration of the testamentary trusts in his Will. James filed his complaint on

July 21, 2004, more than thirteen (13) years after David terminated the trusts. Since KRS

386.735 sets a statute of limitation period for either six months or three years, James claims are

barred by the statute of limitations. Accordingly, the Court will grant Defendant's motion for

summary judgment on all of Plaintiff's claims for breach of fiduciary duty with respect to

Donnie's trust estate.

### 2.     Plaintiff's RICO Claims

In addition to claiming that David breached his fiduciary duty, James also filed a claim

under the Racketeer Influenced and Corrupt Organization Act ("RICO"). Defendant argues that

James has failed to properly assert a RICO claim. In order to state a claim under RICO, a party

must allege: (1) conduct (2) of an enterprise (3) through a pattern of racketeering activity and (4)

injury to the party's business or property. *Sedima , SPRL v. Imrez Co.,* 473 U.S. 479, 496

(1985); *CMI, Inc. v. Intoximeters, Inc.,* 918 F.Supp. 1068, 1089 (W.D. Ky. 1995).

David argues that James fails to identify an enterprise and fails to allege the existence of an

enterprise. James also does not set forth a pattern of racketeering. Furthermore, although James

relies on mail fraud or wire fraud, he does not identify a particularly identified, allegedly

fraudulent communication that was transmitted by mail or wire. Nor does he allege any facts

which state an interstate transportation of stolen property. Finally, David states that even if James

properly pled a RICO claim against David, his claims are barred by the statute of limitations.

Plaintiff responds that Pine Branch is undoubtedly an enterprise as stated in the RICO

statutes. In order to satisfy Section 1962(b), Plaintiff must establish that David was able "to

acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is

engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. §1962. James claims that when David increased his percentage ownership of Pine Branch, he acquired an interest in the enterprise of Pine Branch.

Plaintiff claims that David engaged in racketeering activity by engaging in activities of self-dealing that amount to a "scheme or artifice to defraud". James asserts that David's activities of self-dealing to increase his percentage ownership of Pine Branch amount to a scheme or artifice to defraud. An example given by James of the mails and wires used in furtherance of the scheme include those between David and Blackman Kallick.

The Court agrees with Defendant that James has failed to point to any evidence of a pattern of racketeering activity. He has also failed to point to any specific letter or wire communication or to identify the time, place or contents of any alleged fraudulent communications. Thus, James's RICO allegations are insufficient as a matter of law.

Furthermore, James's RICO claims are governed by a four-year limitation period and began to accrue when Plaintiff knew of or, through the exercise of reasonable diligence, should have discovered, his injury. *See Rotella v. Wood,* 528 U.S. 549, 553 (2000); *Isaak v. Trumball Savings & Loan Co.,* 169 F.3d 390, 399 (6th Cir. 1999). In 1990, James knew about the facts surrounding the purchase of the trust estate's share of Pine Branch stock. James knew that this purchase could have led to an increase in David's percentage ownership of Pine Branch. Accordingly, since James failed to bring RICO claims within four years of knowing of his injury, the RICO claims are barred by the limitation period.

### B.    Estate of Ira D. Duff, Sr.

David argues that James's claim concerning the administration of Don, Sr.'s estate is

17

barred by paragraph 5.4 of Don, Sr.'s Will which absolves David from any and all liability for

decisions made in good faith.  Paragraph 5.4 of Don, Sr.'s Will states:

> My fiduciaries shall not be accountable to any person interested in
> any trust or in my estate for the manner in which, in *good faith*,
> they carry out this direction to minimize overall taxes and expenses
> (including any decision they may make not to incur the expense of
> detailed analysis or alternative choices) and, even though their
> decisions in this regard may result in increased tax or decreased
> distributions to a trust, to my estate, or to one or more
> beneficiaries, it will be their sole judgment as to whether there will
> be any compensation readjustments or reimbursements by reason of
> the manner in which they thus carry out this direction.

(Emphasis added).  David asserts that James has not presented any affirmative evidence that

David's decision to sell the shares of Pine Branch stock to pay the estate's tax liability was not

made in good faith.

In response, James argues that there is a question as to whether David acted in "good

faith" as is required under paragraph 5.4.  James argues that since David was engaging in an act of

self-dealing and he has a pattern of self-dealing in the past, there is a question of whether David

acted with good faith.  Furthermore, James states that David had the ability to defer the estate tax

liability by paying it in installments.  If David had elected to pay the estate taxes in installments,

the dividends on the stock would have been sufficient to pay the installments.  James also

contends that David improperly withheld dividends payable prior to the sale of the shares.

In order to avoid summary judgment, James must present "significant probative evidence"

to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."

*Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).  Conclusory

allegations are not enough to allow a nonmoving party to withstand a motion for summary

18

judgment. *Id.* at 343. David has provided evidence that David sought the advice of professionals and relied on their advice in paying the taxes, he applied all of the stock he was to inherit toward satisfaction of his own proportionate share of estate taxes, which had the effect of increasing Plaintiff's equity ownership and Don, Sr.'s Will waived any conflict of interest by David with respect to using the Pine Branch stock for the payment of taxes. Therefore, James's allegation that David did not act in good faith because he could have elected to pay the tax liability in installments does not amount to significant probative evidence of a lack of good faith by David. Accordingly, the Court will grant David's motion for summary judgment on Plaintiff's claims concerning Don, Sr.

## III.   CONCLUSION

For the foregoing reasons, the Court, being otherwise fully and sufficiently advised,

HEREBY ORDERS that:

[1]   defendant, David A. Duff's motion for summary judgment on plaintiff's claims concerning the trust estate of Ira D. Duff, Jr. [DE #106] is GRANTED;

[2]   defendant, David A. Duff's motion for summary judgment on plaintiff's claim concerning the trust estate of Ira D. Duff, Sr. [DE #107] is GRANTED;

[3]   judgment in favor of the defendant shall be entered contemporaneously herewith; and

[4]   the pretrial conference, currently set for February 16, 2006, and the trial of this matter, currently set for March 21, 2006, are hereby SET ASIDE.

This _____ day of February, 2006.

_____
KARL S. FORESTER, SENIOR JUDGE

19